IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

PAMELA TEAL,                          :
                                      :
              Plaintiff,              :
                                      :         CIVIL ACTION FILE NO.:
v.                                    :         2:09-CV-0187-RWS-SSC
                                      :
CITY OF DAHLONEGA, GEORGIA,           :
and BILL LEWIS, Individually and      :
in His Official as City Manager for   :
the City of Dahlonega, Georgia,       :
                                      :
              Defendants.             :

**NON-FINAL REPORT AND RECOMMENDATION**

This case is before the court on Defendants' motion for summary judgment
[Doc. 56].  For the reasons discussed below, it is **RECOMMENDED** that
Defendants' motion be **GRANTED in part and DENIED in part**.

## I. Procedural History

Plaintiff Pamela Teal  ("Plaintiff") is a woman who was formerly employed by
the City of Dahlonega, Georgia ("the City" or " Defendant Dahlonega") as a City
Marshal.  (See Doc. 5, Am. Compl., ¶¶ 13, 14, 28; Doc. 8, Ans., ¶¶ 13, 14, 28).
On October 27, 2009, Plaintiff filed a complaint [Doc. 1] alleging that: Defendant
Dahlonega discriminated against her because of her sex, in violation of Title VII
of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII")
(Count One); Defendant Dahlonega paid her less than a "male employee
performing substantially similar work," in violation of the Equal Pay Act of 1963,

1

Case 2:09-cv-00187-RWS   Document 85   Filed 08/24/11   Page 2 of 63


29 U.S.C. § 206(d) ("EPA"), and the Fair Labor Standards Act of 1928, 29 U.S.C. § 201 *et seq.* ("FLSA") (Count Two); and Defendant Dahlonega retaliated against her for filing a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), in violation of Title VII and 42 U.S.C. § 1981 (Count Three).

Plaintiff filed an amended complaint in which she added Bill Lewis ("Lewis" or "Defendant Lewis") as a defendant, in his individual capacity and in his official capacity as City Manager for the City of Dahlonega.  [Doc. 5].  In her amended complaint, Plaintiff alleges that: Defendant Dahlonega discriminated against her because of her sex, in violation of Title VII (Count One); Defendants paid her less than a "male employee performing substantially similar work," in violation of the EPA and the FLSA (Count Two); Defendants retaliated against her in violation of Title VII, 42 U.S.C. § 1981 and the EPA (Count Three); and Defendants discriminated against her because of her sex "in violation of Plaintiff's rights under 42 U.S.C. § 1983" (Count Four).[1]

Defendants filed an answer to Plaintiff's amended complaint [Doc.8], and discovery proceeded.  Defendants have now filed a motion for summary judgment, with supporting memorandum, statement of undisputed material facts and supporting exhibits. [Doc. 56].  Plaintiff filed a response to Defendants' motion, with supporting memorandum, statement of disputed material facts, response to

---

[1] Plaintiff also asserts a claim for punitive damages pursuant to § 1983.  (Count V).

Defendants' statement of undisputed material facts and supporting exhibits. [Doc. 62]. Defendants filed a reply [Doc. 78] and a response to Plaintiff's statement of material facts [Doc. 79].

Plaintiff also filed a supplemental brief in order to address the Supreme Court's recent decision in <u>Staub v. Proctor Hospital</u>, 131 S. Ct. 1186 (2011). [Doc. 82]. She also filed an amended statement of material facts to amend paragraph 4 of her statement. [Doc. 83]. Defendants filed a response to Plaintiff's supplemental brief. [Doc. 84].

## II. <u>Facts</u>

### A. <u>Standards for Determining Facts for Summary Judgment</u>

The "facts," for summary judgment purposes only, are derived from Defendants' Statement of Material Facts as to Which There is No Genuine Issue to be Tried [Doc. 56] (hereinafter "Def. SMF"); Plaintiff's response to Defendants' statement [Doc. 62]; Plaintiff's Statement of Additional Material Facts Presenting a Genuine Issue for Trial [Doc. 62] (hereinafter "Pl. SMF") and amended statement [Doc. 83]; Defendants' response to Plaintiff's statement [Doc. 79]; and uncontroverted record evidence. Where material facts are in dispute, the differing versions are set out.

The court has reviewed the record, including the parties' filings, to determine whether genuine issues of material fact exist to be tried. However, the court is not obligated to "scour the record" to make that determination. <u>Tomasini v. Mt. Sinai Med. Ctr. of Fla.</u>, 315 F. Supp. 2d 1252, 1260 n.11 (S.D. Fla. 2004).

3

The facts are construed in the light most favorable to Plaintiff as the non-movant. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1309 (11th Cir. 2001).

## B.   **The Facts Relevant to Defendants' Motion for Summary Judgment**[2]

Plaintiff was hired by the City as a Code Enforcement Officer in September 2002. (Def. SMF ¶ 1). She was the only Code Enforcement Officer employed by the City. (Teal Dep. at 107-08). As a Code Enforcement Officer, Plaintiff was responsible for "[r]outine patrol"—her "first task was to clean the trash out of the city," such as "abandoned cars and illegal dumping" and "grass grown up shoulder-high." (Teal Dep. at 114). She enforced city ordinances, rewrote ordinances, provided security and traffic direction after accidents or during special events, and responded to calls for service such as parking issues. (Teal Dep. at 115-16). At some point, she was also assigned soil and erosion control responsibilities. (Teal Dep. at 114-15). She was also responsible for "processing and inspecting alcoholic beverage applications, permits, and licenses, enforcing the City's alcoholic beverage ordinances, inspecting premises that served alcoholic beverages to ensure compliance with all terms and conditions of city-issued permits and licenses, [and] processing and monitoring vehicle for hire and horse-drawn carriage applications and licenses . . . ." (Ex. B to Doc. 62, Teal Decl., ¶ 3). Unless there was a festival or other event, Plaintiff worked Monday through Friday, 8 a.m. to 5 p.m. (Teal Dep. at 111).

---

[2] Certain other facts relevant to the undersigned's consideration of the motion are discussed in the body of this Report.

Defendant Lewis became the City Manager in December 2003. (Lewis Dep. at 14). After Lewis was hired as the City Manager, Plaintiff reported directly to him for the remainder of her employment with the City. (Def. SMF ¶ 3).

In February 2004, Plaintiff's job title changed from Code Enforcement Officer to City Marshal. (See Def. SMF ¶ 4; Pl. Resp. to Def. SMF ¶ 4). Plaintiff's job responsibilities remained largely the same. (Def. SMF ¶ 5).

According to Plaintiff, within 6 months of the time Lewis became City Manager, he asked her to take her "Chief of Police" certification[3] down from her office wall. (Teal Dep. at 144, 282-84). Plaintiff responded by telling Lewis, among other things, "I earned it, and I don't want to take it down." (Id. at 144). Lewis told Plaintiff, "Well, I think it's presenting the wrong image, just like some of this other stuff you've got hung up in here." (Id.). Plaintiff recounted other statements Lewis made to her at about the same time:

> [H]e never liked women in law enforcement, and he wanted me to take that little certificate down and that I was projecting the wrong image, which I never fully understood. And he just said, "We just don't need, number one, a marshal's office down here, and we don't need you being the administrator over it."

(Id. at 283).[4]

---

[3] Plaintiff went to "Chief's school" after she started working for the City. (Teal Dep. at 132-33). Plaintiff asserts that "[t[he City designated Plaintiff its 'chief' City Marshal in or around 2004." (Pl. SMF ¶ 3). It is uncontroverted that she was the only City Marshal at that time, and she did not supervise any employees, including other marshals, even after the City hired another marshal. (See Teal Dep. at 107-08, 152-53; Def. SMF ¶ 12).

[4] Lewis denies that he told Plaintiff he did not want her to display her Chief of Police certificate, and he denies that he ever told her he does not like women in law enforcement administration positions. (Lewis Dep. at 54, 148-49).

The City hired a second marshal, Stacy Jarrard, in November 2006. (Pl. SMF ¶ 5). Jarrard reported directly to Lewis for the entirety of his employment. (Def. SMF ¶ 11). Jarrard was hired as a marshal "and a noncertified [or nonlicensed] building inspector as well"—he handled code enforcement responsibilities and building inspections. (Teal Dep. at 174, 177; see also id. at 280-81). When asked during her deposition, "So he did everything you did plus building inspections?" Plaintiff responded, "Right." (Id. at 175).[5] Jessie Layne had worked as the City's Building Inspector until he left in September 2006, but when Jarrard was hired as a marshal, he took over those responsibilities, as well as code enforcement responsibilities. (Lewis Decl., Ex. 12 to Doc. 56, ¶ 6; Teal Dep. at 174-77). Before being hired by the City, Jarrard worked in law enforcement for 13 years at the Lumpkin County Sheriff's Office and for 5 years at the Forsyth County Sheriff's Department and Dawson County Sheriff's Department, and he also had prior work experience in the construction and home building industry. (Def. SMF ¶¶ 13, 14; Pl. Resp. to Def. SMF ¶¶ 13, 14).[6]

Throughout Plaintiff's employment, both she and Jarrard enforced sign, parking, and zoning ordinances, performed court security, had soil and erosion

---

[5] In her errata sheet, Plaintiff added to that testimony: "Right, except for a few things. We did the exact same duties except where he did building inspections, I did taxi service, horse drawn carriage and alcohol licensing."

[6] Before she began working for the City, Plaintiff had worked as a police officer for the Gainesville Police Department and as a Corrections Counselor for the Georgia Department of Corrections, and she had a bachelor's degree in social work and a master's degree in human resources. (Teal Decl., Ex. B to Doc. 62, ¶ 2).

control responsibilities, enforced other city ordinances, and addressed any violations of the same. (Pl. SMF ¶ 9). Jarrard had building inspection duties, which Plaintiff did not. (Teal Decl., ¶ 8). Plaintiff also had duties that Jarrard did not share—she was responsible for processing license applications and enforcing codes concerning vehicles for hire, horse-drawn carriages and establishments that serve alcoholic beverages. (Id.).

Plaintiff was paid an hourly rate of $20.29 during the time period that both she and Jarrard were employed with the City. (Def. SMF ¶ 59). Jarrard was paid an hourly rate of $21.39 from November 2006 through December 2007, and an hourly rate of $22.46 for the remainder of his employment. (Def. SMF ¶ 60).

Lewis counseled or criticized Plaintiff on several occasions for work-related issues, such as being rude to citizens, wearing her gun, not having a positive attitude, wrongfully issuing citations, inadequate decision-making skills, and being outside the City limits in the City vehicle. (See Teal Dep. at 159, 181, 184-85, 193, 203-04, 210, 212; Exs. 5, 6, 7 & 8 to Teal Dep.).

On November 11, 2007, Plaintiff sustained a hairline fracture in her left arm and a torn rotator cuff in a fall at the house of a friend, attorney Rebecca Merry. (Def. SMF ¶ 27). As a result of her injury, Plaintiff was unable to return to work for several days. (Def. SMF ¶ 29).

Instead of telling Lewis that she fell at her friend's house, Plaintiff told him that she fell at her cousin's house because, according to Plaintiff, Lewis did not like Merry and did not approve of Plaintiff's friendship with her. (Teal Dep. at 222-

23).[7]  However, it became known at the City that Plaintiff's account of the incident

to Lewis was not true.  Plaintiff believed that Jimmy Wood, a security guard at

Merry's complex, called and told an employee at City Hall that Plaintiff had hurt

her arm at Merry's house, contrary to what Plaintiff told Lewis, so Plaintiff told

Wood that if she lost her job because of him, she would "kill his ass[.]" (Id. at 216-

18, 233-35).  According to Plaintiff, her comment to Wood, who is an old friend of

hers, was just a joke.  (Teal Dep. at 233).  Wood testified that he did not take

Plaintiff seriously, and that she "was just kidding." (Wood Decl., Ex. G to Doc. 62,

¶¶ 4, 6).

Lewis then told Jarrard that Plaintiff "had made a threat of killing [Wood],"

and he asked Jarrard to get a statement from Wood.  (Jarrard Dep. at 47).[8]  On

December 6, 2007, Jarrard went to Wood's place of business to get a witness

statement about Plaintiff's comment, and according to Wood, he told Jarrard that

Plaintiff had made the comment, but that "it was a joke and . . . I was not

threatened." (Wood Decl., ¶ 9; Jarrard Dep. at 49).[9]  While Jarrard was present

at Wood's business, Lewis called Jarrard, and Wood spoke with Lewis.  (Wood

---

[7] Lewis denies that he ever indicated to Plaintiff that he did not want Plaintiff "hanging out" with Merry.  (Lewis Dep. at 72).

[8] The parties have not explained how Lewis learned of the alleged threat, but the undersigned notes that Wood apparently discussed Plaintiff's comment with City employee Oma Lou Stewart and City Council member Bill Scott.  (See Ex. 12 to Teal Dep. at 1298, 1302).

[9] Jarrard wrote a statement following his meeting with Wood indicating that Wood told Jarrard that he and Plaintiff had a conversation during which Plaintiff "started cursing him and stated that if she lost her job because of him that she would kill his ass you son of a bitch," and "she then hung up on him." (Ex. 4 to Jarrard Dep.).

8

Decl., ¶ 10; Jarrard Dep. at 53).  Wood alleges that Lewis told Wood he had "been looking for a reason to fire this bitch for 4 years and this is it." (Wood Decl., ¶ 10).[10]  Wood told Lewis he "was not getting involved in his witch hunt, and . . . [he] did not want [Plaintiff] fired and . . . [he] had not been threatened by her, that she was only kidding."  (Id.).  According to Wood, Lewis called Wood later to ask him "to sign a statement against [Plaintiff]," Wood refused (id., ¶¶ 12-14), and Lewis then "got very upset with [Wood]" and "threatened to have Jarrard arrest [Wood] for not giving the statement" (id., ¶ 14).   Wood told Lewis that Jarrard could not arrest him, and Lewis responded that Jarrard "might not be able to arrest [him], but he could make sure [Wood's] business license, which was issued by the City of Dahlonega, did not get renewed."  (Id.).[11]

Lewis testified that after Plaintiff came back to work following her injury, "[he] learned from Chris Head and Ricky Stewart, two City employees, of their concern that [Plaintiff] was spending a lot of time away from City Hall during her regular work hours," and that "for the last several months [she] would report to work in the morning, disappear from City Hall during the work day, and return to City Hall shortly before her workday ended at 5:00 p.m." (Def. SMF ¶ 34; Lewis

---

[10] Lewis denies that he ever called Plaintiff a bitch or that he told Wood he "had been looking for a way to get rid of that bitch for four years[.]"  (Lewis Dep. at 149).

[11] Lewis denies that he told Wood he would have him arrested or that he would prevent his business license from being renewed if Wood did not give a statement about Plaintiff and her alleged threat.  (Lewis Dep. at 123-24).

Decl., Ex. 12 to Doc. 56, ¶ 11).[12]  On December 6, 2007, Lewis instructed Jarrard to conduct surveillance on Plaintiff the next day.  (Def. SMF ¶ 35; Pl. Resp. to Def. SMF, ¶ 35).

On December 7, 2007, Plaintiff was scheduled to work a normal work day from 8:00 a.m. until 5:00 p.m.  (Def. SMF ¶ 36).  She arrived at work a few minutes before 8 a.m., filled out fingerprint cards, then took the City vehicle, a Chevrolet Blazer, home, where she arrived at 12:09 p.m.  (Teal Dep. at 239-40, 243-44).  Jarrard watched Plaintiff's residence from approximately 11 a.m. until after 4 p.m. that day.  (Jarrard Dep. at 35, 72).  He observed Plaintiff leave the residence in the Blazer at 12:12 p.m. and return at 12:30 p.m.; otherwise, the Blazer remained at Plaintiff's residence.  (Jarrard Dep. at 39-40, 42).  Someone left Plaintiff's residence at some point in Plaintiff's personal vehicle and returned at approximately 3:02 p.m., but Jarrard could not identify the occupants of the vehicle.  (Jarrard Dep. at 39-41).  Jarrard observed the Blazer leave Plaintiff's

---

[12] In response to Def. SMF ¶ 34, Plaintiff asserts, citing to Head's deposition at page 20 and Stewart's deposition at page 23, that "in their depositions, both Chris Head and Ricky Stewart denied discussing such matters with Defendant Lewis prior to Plaintiff's suspension." (Pl. Resp. to Def. SMF, ¶ 34).  Plaintiff did not file Mr. Stewart's deposition, however, or provide a copy of the cited page in support of her response.  Furthermore, in her deposition, Head was not asked whether she "discuss[ed] such matters with Defendant Lewis prior to Plaintiff's suspension," nor did she deny having any such conversation.  She was asked whether she "recall[ed] any specific conversation with Bill Lewis before the Huhn interview," discussed *infra*, and she responded "No, I do not." (Head Dep. at 19).  She also testified that she did not have any conversations with Lewis after the Huhn interview.  (Id. at 20).  She was also asked whether she had any conversations "prior to the Huhn interview with Mr. Lewis about Pamela Teal," and she responded, "No, sir.  Other than maybe, you know, what are we going to do about work, what's going on; that type of thing." (Id.).

The undersigned notes that Tim Huhn's investigative report, discussed in more detail *infra*, indicates that Head and Stewart gave Huhn information consistent with Lewis's testimony.  (See Ex. 12 to Teal Dep. at 1277-78, 1291-92).

residence at 3:17 p.m., and Jarrard's friend Michael Gravely followed it while Jarrard remained at the residence. (Jarrard Dep. at 25, 72). Gravely reported to Jarrard that he observed Plaintiff go to a bank and to Wal-Mart. (Jarrard Dep. at 43-44, 71). Plaintiff returned home at approximately 4:02 and then left home at 4:17 and went to City Hall. (See Statement Attach. to Ex. 1 to Jarrard Dep.). Jarrard reported his and Gravely's observations to Lewis sometime between 4:00 and 4:45 p.m. that day, and Jarrard then returned to City Hall. (Jarrard Dep. at 43, 72). Lewis asked Jarrard to remain at City Hall until he arrived; Lewis arrived at approximately 5:00 p.m. (See Statement Attach. to Ex. 1 to Jarrard Dep.).

Plaintiff left City Hall for the day at 4:57 p.m. (Def. SMF ¶ 43). Shortly after she left, while she was still driving home, Lewis called her and told her he needed her to return to City Hall. (Teal Dep. at 249-50). Plaintiff told Lewis she needed to go home because her arm was causing her pain, and she asked him what he needed, but he would not tell her. (Id. at 250). Instead, Lewis told her, "I'm giving you a direct order to come back to City Hall." (Id. at 251). She responded, "Let me call my attorney and see what she says." (Id.). Teal then called her attorney friend Rebecca Merry, and after Plaintiff arrived home, she called Lewis back. (Id. at 251-53). In her deposition, Plaintiff testified: "I told him I took a pain pill, I wasn't able to drive back, and to do what he had to do, because I knew it was coming." (Id. at 252).

The next day, December 8, 2007, Lewis gave Plaintiff written notification of his decision to place her on paid, non-disciplinary administrative leave. (Def. SMF

¶ 47; Pl. Resp. to Def. SMF ¶ 47).

The City then retained a private investigator named Tim Huhn of Huhn & Associates, Inc. to conduct an investigation into Plaintiff's conduct.  (See Ex. 3 to Huhn Dep.).[13]  The City Attorney, J. Douglas Parks, and Lewis contacted Huhn about the investigation, and Parks signed the Engagement Agreement between the City and Huhn & Associates.  (Huhn Dep. at 23-24; Ex. 3 to Huhn Dep.).  Parks told Huhn "they had a city employee that was placed on administrative leave, and they needed to have some investigation conducted by an independent, impartial third party . . . ."  (Huhn Dep. at 25).  The scope of the issues to be investigated included:

- Providing false information relating to the circumstances giving rise to her need for sick leave;

- Failure to comply with the City Manager's instructions that she meet with him at City Hall;

- Interfering with the City's preliminary investigation by making threats/intimidating a witness(es), or otherwise;

- Making a threat of violence to a member of the public;

- Conducting personal business and using a company vehicle for personal business during working hours when employed by the city; and

- Any other information that may be uncovered during the investigation that would be improper conduct of a City employee.

_____

[13] Huhn is a former Special Agent with the Federal Bureau of Investigation.  (Huhn Dep. at 9; Lewis Dep. at 60).

12

(Ex. 3 to Huhn Dep.).

During his investigation, Huhn interviewed several City employees with whom Plaintiff worked.  (Def. SMF ¶ 49).[14]  Huhn prepared summaries of the interviews, which each witness corrected and signed.  (Huhn Dep. at 106).  Huhn was unable to interview Wood because Wood refused to meet with him.  (Def. SMF ¶ 51; Pl. Resp. to Def. SMF ¶ 51).  Huhn never interviewed Plaintiff.  (Huhn Dep. at 102).  Lewis called Plaintiff and told her to call Huhn, and Plaintiff responded, "You need to tell him to call me.  I don't know this man."  (Teal Dep. at 256; Lewis Dep. at 91).  Plaintiff also told Lewis that she could not speak with Huhn without her attorney present, although she testified, "That was a bluff.  I did say it, but I didn't have [an] attorney."  (Teal Dep. at 259).  Huhn's assistant contacted Plaintiff and made an appointment for Plaintiff to meet with Huhn, but the meeting was postponed, and Plaintiff "never heard anything back."  (Id. at 257).

On March 5, 2008, Plaintiff filed an EEOC charge in which she alleged that Defendant paid her less than a younger male marshal, in violation of Title VII, the EPA and the Age Discrimination in Employment Act ("ADEA").  (Ex. 15 to Teal Dep.).

Following his investigation, Huhn prepared a Report of Investigation dated March 8, 2008.  (Ex. 12 to Teal Dep.).  The Report of Investigation was provided to the City, including members of its City Council, who reviewed the Report.  (See

---

[14] Huhn communicated with Parks and Lewis during the investigation, although he did not discuss with Lewis "the investigation and specifically what witnesses said[.]" (See Exs. 8-15, 17-19, 21 to Huhn Dep.; Huhn Dep. at 126-28, 138-39).

13

Laboa Decl., Ex. 11 to Doc. 56, ¶ 5; Lord Decl., Ex. 13 to Doc. 56, ¶ 5; Peters Decl., Ex. 14 to Doc. 56, ¶ 5; Scott Dep. at 51-53).

On April 7, 2008, Lewis prepared a Notice of Proposed Adverse Action recommending the termination of Plaintiff's employment (Ex. 13 to Teal Dep.),[15] discussed *infra*.

Thereafter, the City Council met to consider the proposed termination of Plaintiff's employment. (Lewis Dep. at 149-50). Plaintiff was not given the date of the City Council's meeting or invited to it. (Pl. SMF ¶ 38; Def. Resp. to Pl. SMF, ¶ 38). During the meeting, the City attorney presented information to the Council about the proposed action, including the Notice of Proposed Adverse Action, and he answered questions about the investigation into Plaintiff's conduct as set forth in that Notice. (Lewis Dep. at 74, 149-51, 155-56). No facts were presented other than those contained in the Notice. (Lewis Dep. at 156-57). On April 10, 2008, the City Council voted unanimously to uphold the recommended termination and terminated Plaintiff's employment effective that day. (Ex. 14 to Teal Dep.). The Council's decision was conveyed to Plaintiff by way of letter and Notice of Adverse Action on April 14, 2008. (Def. SMF ¶ 57; see also Ex. 14 to Teal Dep.).

Jarrard continued to work for the City until October 2008. (Lewis Decl., ¶ 8).[16]

---

[15] Plaintiff received that Notice "shortly after the 7th." (Teal Dep. at 265).

[16] Jarrard is now the Sheriff of Lumpkin County. (Jarrard Dep. at 8).

On September 29, 2008, Plaintiff amended her previous EEOC charge to add a claim that she was terminated because of her sex and age, in violation of Title VII and the ADEA.  (Ex. 16 to Teal Dep.).  She also filed a separate charge on that date in which she alleged that she was terminated in retaliation for filing the previous charge, in violation of Title VII.  (Ex. 17 to Teal Dep.).

### III. __Summary Judgment Standard__

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by[] . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1).  The moving party has an initial burden of informing the court of the basis for the motion and showing that there is no genuine issue of material fact.  Celotex Corp v. Catrett, 477 U.S. 317, 323 (1986); see also SEC v. Morgan Keegan & Co., No. 1:09-cv-1965-WSD, 2011 U.S. Dist. LEXIS 71481, at *13 (N.D. Ga. June 28, 2011) ("The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact." (citing Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999)).  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, he must

15

respond by going beyond the pleadings, and by his own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial.  See Celotex, 477 U.S. at 322, 324.  "No genuine issue of material fact exists if a party has failed to 'make a showing sufficient to establish the existence of an element . . . on which that party will bear the burden of proof at trial.' "  AFL-CIO v. City of Miami, 637 F.3d 1178, 1186-87 (11th Cir. 2011) (quoting Celotex, 477 U.S. at 322).

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial."  Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991), cert. denied, 506 U.S. 952 (1992); see also Fed. R. Civ. P. 56(c)(1)(B) and (4).  The evidence "cannot consist of conclusory allegations or legal conclusions."  Avirgan, 932 F.2d at 1577.  Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment.  See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984).

A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Id. at 249-

16

50 (internal citations omitted).  It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter.  Id. at 249, 255.  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  Id. at 255.

## IV.  Discussion

### A.   Plaintiff's 42 U.S.C. § 1981 Retaliation Claim

In Count Three of her amended complaint, Plaintiff appears to assert retaliation claims pursuant to 42 U.S.C. § 1981.  (Doc. 5, Am. Compl., ¶¶ 57, 58).  Citing Anderson v. Dunbar Armored, Inc., 678 F. Supp. 2d 1280, 1305-06 n.16 (N.D. Ga. 2009), adopted by 678 F. Supp. 2d 1280, 1289-90 (N.D. Ga. 2009), Defendants move to dismiss Plaintiff's § 1981 claim on the ground that § 1981 does not prohibit discrimination based on sex.  (Doc. 56, Def. Br. at 31 n.27).  In response to Defendants' motion for summary judgment, Plaintiff "agrees with Defendants that her § 1981 retaliation claim should be dismissed."  (Doc. 62, Pl. Br. at 33 n. 28).

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's 42 U.S.C. § 1981 retaliation claim.

### B.   Plaintiff's Title VII and 42 U.S.C. § 1983 Sex Discrimination Claims (Counts One and Four)

In Counts One and Four of the amended complaint, Plaintiff alleges that Defendant Dahlonega discriminated against her because of her sex in violation of

17

Title VII and that both Defendants discriminated against her because of her sex in violation of her 14th Amendment right to equal protection, made actionable by § 1983.  In response to Defendants' motion for summary judgment, she alleges that Defendants discriminated against her by paying her less than a similarly situated male employee and by terminating her.  (Doc. 62, Pl. Br. at 19-30).[17]

Title VII provides, "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]"  42 U.S.C. § 2000e-2(a)(1).  Section 1983 of Title 42 of the United States Code provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

---

[17] In her amended complaint, Plaintiff also alleges that Defendants discriminated against her by subjecting her to a hostile environment and by suspending her. (See Doc. 5, Am. Compl., ¶¶ 49, 61).  In response to Defendants' motion for summary judgment, Plaintiff limits her discussion of her sex discrimination claims to her wage and termination claims.  (See Doc. 62, Pl. Br. at 19-30).  Defendants argue that "Plaintiff abandoned her claim of discrimination based on Defendant Lewis' decision to place her on leave pending an investigation," presumably by failing to respond to Defendants' arguments about that claim. (Doc. 78, Reply at 2 n.1).  However, in her supplemental brief, Plaintiff denies that she has abandoned her suspension "claim." (Doc. 82, Pl. Br. at 4 n.6).

Because Plaintiff has not, in her response to Defendants' motion for summary judgment, treated her allegations of discriminatory hostile work environment and suspension as separate claims of sex discrimination, the undersigned has not addressed them as such.  Rather, the undersigned has considered those allegations as part of the evidence Plaintiff presents to demonstrate discriminatory animus with respect to her wage and termination claims.

Discrimination claims under Title VII and § 1983 are analyzed under the same standards.  See Brown v. Ala. DOT, 597 F.3d 1160, 1174 n.6 (11th Cir. 2010) (explaining that the analysis under § 1983 claims "mirrors that under Title VII").  Therefore, the following analysis of Plaintiff's Title VII claims also applies to her § 1983 claims.

### 1.     **Analytical Framework for Disparate Treatment Claims**

A Title VII plaintiff may establish a *prima facie* case of sex discrimination in more than one way.   First, she may produce credible direct evidence of discriminatory intent.  See Morris v. Emory Clinic, 402 F.3d 1076, 1081 (11th Cir. 2005); accord EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).   Direct evidence of discrimination is evidence that, if believed, would establish without inference or presumption that the employer's decision was motivated by discriminatory intent.  Morris, 402 F.3d at 1081; Joe's Stone Crab, 220 F.3d at 1286.  If a plaintiff produces direct evidence, the burden then shifts to the defendant to prove by a preponderance of the evidence that the same employment decision would have been reached in the absence of the discriminatory intent.  See Lee v. Russell County Bd. of Educ., 684 F.2d 769, 774 (11th Cir. 1982).

A Title VII plaintiff may also establish a *prima facie* case of discrimination through circumstantial evidence under the framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973) and Texas Department of

<u>Community Affairs v. Burdine</u>, 450 U.S. 248 (1981).[18]  If a plaintiff presents a

*prima facie* case through circumstantial evidence, the burden then shifts to the

defendant to articulate a legitimate, nondiscriminatory reason for its action.

<u>Morris</u>, 402 F.3d at 1081.  If the defendant satisfies this rebuttal burden, the

burden shifts to the plaintiff to show that the defendant's "explanation is

inadequate, a mere pretext" for discrimination.   <u>Id.</u>   In <u>Burdine</u>, the Court

explained the next step, once the defendant employer articulates a legitimate, non-

discriminatory reason for the employment decision:

> [The plaintiff] now  must have the opportunity to demonstrate that
> the proffered reason was not the true reason for the employment
> decision.  This burden now merges with the ultimate burden of
> persuading the [factfinder] that she has been the victim of intentional
> discrimination.   She may succeed in this either directly by
> persuading the [factfinder] that a discriminatory reason more likely
> motivated the employer or indirectly by showing that the employer's
> proffered explanation is unworthy of credence.

<u>Burdine</u>, 450 U.S. at 256.  The Supreme Court explained further in <u>St. Mary's</u>

<u>Honor Center v. Hicks</u>, 509 U.S. 502, 508-09 (1993), that the jury's disbelief of the

employer's proffered explanation does not mandate a finding of intentional

discrimination but rather *permits* the jury to make that finding.   The Court

elaborated:

> The factfinder's disbelief of the reasons put forward by the defendant

---

[18] The method of proving unlawful discrimination using the burden-shifting scheme discussed above is frequently referred to as the <u>McDonnell Douglas/Burdine</u> framework or burden-shifting analysis. <u>See, e.g.</u>, <u>Thomas v. Tenneco Packaging Co.</u>, 293 F.3d 1306, 1315 (11th Cir. 2002); <u>Johnson v. Booker T. Washington Broad. Serv., Inc.</u>, 234 F.3d 501 (11th Cir. 2000).

(particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.  Thus, rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination . . . .

Hicks, 509 U.S. at 511 (emphasis in original) (footnote omitted).

The Eleventh Circuit recently emphasized that "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case."  Smith v. Lockheed-Martin Corp., No. 09-15428, 2011 U.S. App. LEXIS 13363, at *17 (11th Cir. June 30, 2011).  The court explained that "[a] plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence," and that "no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper."  Id. at *19-20.

In this case, Plaintiff does not assert that she has presented direct evidence of sex discrimination; rather, she contends that she can establish a *prima facie* case of discrimination under the McDonnell Douglas framework.  (See Doc. 62, Pl. Br. at 19-20, 22-23).  Therefore, the undersigned analyzes Plaintiff's claim under the McDonnell Douglas/Burdine burden shifting framework for proving a circumstantial case of discrimination.

**2.     Plaintiff's Wage Discrimination Claim**

a.   **Plaintiff's *Prima Facie* Case**

"Under the *McDonnell Douglas/Burdine* approach, a female Title VII plaintiff establishes a *prima facie* case of sex discrimination by showing that she occupies a job similar to that of higher paid males." Meeks v. Computer Assocs. Int'l., 15 F.3d 1013, 1019 (11th Cir. 1994) (citing Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1529 (11th Cir. 1992)).[19] "Though the standard for 'similarity' in Title VII cases is 'relaxed' compared to the EPA standard [addressed *infra*] and does not require a showing that the job be substantially identical, [Plaintiff] still must prove that her job was 'substantially similar' to a higher paid comparator." Hooper v. Total Sys. Servs., Inc., No. 4:08-CV-159 (CDL), 2011 U.S. Dist. LEXIS 70394, at *26-27 (M.D. Ga. June 30, 2011) (citing Mulhall v. Advance Sec., Inc., 19 F. 3d 586, 598 (11th Cir.), cert. denied, 513 U.S. 919 (1994)).

It is undisputed that Jarrard was paid more than Plaintiff when they were both employed as City Marshals.  Plaintiff argues that "the marshals' job duties were substantially similar" (Doc. 62, Pl. Br. at 21), while Defendants argue that "Jarrard perform[ed] building inspector duties that Plaintiff did not perform," and "the record reflects that these duties actually comprised the majority of his work for the City." (Doc. 56, Def. Br. at 16 (emphasis in original)).  The undersigned will assume without deciding that Plaintiff can create a genuine issue of material fact on each element of her *prima facie* Title VII case of wage discrimination.

---

[19] In Miranda, the Eleventh Circuit held that the McDonnell Douglas/Burdine framework provides the appropriate proof model for Title VII wage discrimination claims.

### b.   **Legitimate, Non-Discriminatory Reason for Employment Decision**

The employer's burden to articulate a legitimate, non-discriminatory reason for its employment decisions is one of production, not persuasion.  Standard v. A.B.E.L Servs., 161 F.3d 1318, 1331 (11th Cir. 1999).  This burden is "exceedingly light."  Turnes v. Amsouth Bank, N.A., 36 F.3d 1057, 1060-61 (11th Cir. 1994) (internal quotation omitted).

Defendants have presented evidence that they paid Jarrard more than Plaintiff because they hired Jarrard, who had experience in construction, to perform the building inspection duties performed by the former building inspector, which Plaintiff did not perform, **and** to perform code enforcement duties.  (See Lewis Decl., Ex. 12 to Doc. 56, ¶¶ 6, 7, 9).  Lewis testified,

> In addition to several years of prior work experience in law enforcement, which more than qualified him to handle code enforcement responsibilities, Mr. Jarrard also had prior experience in the construction and home building industries, which was instrumental in allowing him to handle building inspection responsibilities.  By hiring Jarrard, the City was also afforded greater flexibility in code enforcement because he could perform building inspections as well as handle code enforcement responsibilities as needed.

(Id. at ¶ 7).  Lewis also testified:

> The decision was made to pay Mr. Jarrard a higher hourly rate than [Plaintiff] because of his additional job responsibilities related to building inspections, which [she] did not perform, and due to his prior work experience in residential construction.

(Id. at ¶ 9).

The undersigned finds that Defendants have met their "exceedingly light" burden of articulating a legitimate, non-discriminatory reason for paying Jarrard more than Plaintiff.

      c.    **Pretext**

Because Defendants have articulated a legitimate, non-discriminatory reason for paying Jarrard more than Plaintiff, Plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision" in order to survive summary judgment. Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (quoting Combs v. Plantation Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1528 (11th Cir. 1997), cert.denied, 522 U.S. 1045 (1998)).  The court's role at this juncture is to "evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs, 106 F.3d at 1538 (internal quotation omitted).

In making the required pretext showing, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer." Chapman, 229 F.3d at 1030.  Rather,

"[p]rovided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id.

Plaintiff asserts that Defendants' reasons for the pay differential are pretextual because "Plaintiff's job duties and Marshal Jarrard's were substantially the same, and Defendants cannot rest on a nonexistent or immaterial difference in duties to justify an admitted difference in pay." (Doc. 62, Pl. Br. at 21-22). But Plaintiff's conclusory assertions about the significance of, or amount of time Jarrard spent on, his building inspection duties are insufficient to create an issue of fact on whether Defendants' reasons for paying him more than Plaintiff are pretextual. Plaintiff has not controverted evidence that the City hired Jarrard to replace the former building inspector, Layne, **and** to perform code enforcement duties. In fact, Plaintiff herself testified that Jarrard was hired as a marshal and as a building inspector, to handle code enforcement and building inspections. (Teal Dep. at 174-77, 280-81). By hiring Jarrard, the City was able to hire someone to replace another employee and to perform additional tasks in code enforcement.

Furthermore, while Plaintiff asserts in conclusory fashion that Jarrard spent the majority of his time on "shared duties" with Plaintiff, she does not cite to evidence supportive of that assertion. (Doc. 62, Pl. Br. at 20). Although she refers

to Jarrard's building inspection duties as "incidental" in her Declaration (Teal Decl., Ex. B to Doc. 62, ¶ 8), she does not support that characterization.  Jarrard, who actually performed the building inspection work, testified that "approximately seventy-five percent (75%) of [his] time was spent performing [his] job responsibilities as a building inspector, while the remainder of [his] time was spent performing [his] job responsibilities related to code enforcement."  (Jarrard Decl., Ex. 10 to Doc. 56, ¶ 3; see also Lewis Decl., Ex. 12 to Doc. 56, ¶ 7).[20]  Plaintiff has not presented evidence to controvert that testimony.

Plaintiff also questions Defendants' reliance on Jarrard's construction experience because "Jarrard had to agree to enroll in building inspection classes, had not worked in construction for over 13 years, had never worked as a building inspector, and held no licenses or certifications as a building inspector."  (Doc. 62, Pl. Br. at 22).  Those assertions do not create a jury question on pretext, either.  In the first place, the evidence Plaintiff cites in support of her assertions, pages 15 through 17 of Jarrard's deposition, does not support the allegation that Jarrard "had not worked in construction for over 13 years."[21]  Furthermore, Plaintiff has not shown that Jarrard was required to have any of the qualifications she lists in

---

[20] The fact that Plaintiff had duties that Jarrard did not perform, such as those involving "alcohol-serving establishments" (see Doc. 62, Pl. Br. at 22), does not call into question whether Defendants paid Jarrard more than Plaintiff for the articulated reasons, i.e., because he was hired to perform, and did perform, building inspections and to assist with code enforcement responsibilities.

[21] Jarrard testified that he had worked for the Lumpkin County Sheriff's Department for 13 years prior to working for the City (Jarrard Dep. at 19), but that testimony does not show that he did not also engage in construction work during that time.

26

order to be hired or to perform building inspections. Moreover, she has not controverted evidence that Jarrard's experience in construction gave him knowledge of framing, plumbing and electrical systems required to perform building inspections. (Jarrard Dep. at 18). Plaintiff's apparent belief that Jarrard should have been more qualified does not call into question evidence that Jarrard had construction experience, he was hired to perform building inspections after the previous building inspector left, and he performed building inspections.

Finally, Plaintiff contends that "a reasonable factfinder could also consider Lewis's sexist comments to Plaintiff as additional evidence that Defendants' proffered explanations for Plaintiff's lesser pay lack credence." (Doc. 62, Pl. Br. at 22 n.19). Plaintiff apparently refers to Lewis's alleged statement to her, made shortly after he became City Manager, that he "never liked women in law enforcement" (Teal Dep. at 283), and perhaps refers to a statement Lewis allegedly made to Wood in December 2007 that he had "been looking for a reason to fire this bitch for 4 years . . . ." (Wood Decl., Ex. G to Doc. 62, ¶ 10). As discussed *infra*, the undersigned finds that those comments raise a reasonable inference that Lewis was motivated by discriminatory animus when he recommended that Plaintiff be terminated. However, the comments were not made in the context of the decision to hire Jarrard or to determine his pay or the decision to set Plaintiff's pay, and the undersigned finds therefore that they are not sufficient to create a jury question on pretext with respect to Plaintiff's pay discrimination claim,

particularly given the uncontroverted evidence that Jarrard was hired to perform building inspections after the previous building inspector left **and** to perform code enforcement duties. See, e.g., Rojas v. State of Fla., 285 F.3d 1339, 1343 (11th Cir. 2002) (finding that, in the absence of "fairly strong additional evidence support[ing] a finding of pretext[,] . . . an isolated comment, unrelated to the decision [at issue] is insufficient to establish a material fact on pretext").

Because Plaintiff has not created an issue of fact on whether Defendants' reasons for paying Jarrard more than Plaintiff were pretextual, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's Title VII wage discrimination claim.

### 3.    Plaintiff's Discriminatory Termination Claim

#### a.    Plaintiff's *Prima Facie* Case

Defendants "[a]ssum[e] without conceding that Plaintiff can establish a prima facie case" of discriminatory termination (Doc. 56, Def. Br. at 23), but they argue that they are entitled to summary judgment on that claim because they have articulated legitimate, non-discriminatory reasons for the termination decision, and Plaintiff cannot show that those reasons are pretextual (see id. at 23-28).[22]

---

[22] In response to Plaintiff's supplemental brief, Defendants argue that one of the "principal bases for their Motion" is "Plaintiff's inability to establish a prima facie case of gender discrimination in connection with the decision to terminate her employment . . . ." (Doc. 84, Def. Br. at 3). Defendants do not support or elaborate on that assertion, and it appears to be unsupported by their brief in support of their motion for summary judgment. (See Doc. 56, Def. Br. at 23).

The undersigned finds that Plaintiff has created an issue of fact on each element of her *prima facie* case: she is a woman; she was arguably qualified for her job;[23] she was terminated; and it appears that after she was terminated, Jarrard, a male employee, continued to perform her duties (see Ex. Q to Doc. 62 at 7).[24]

### b.   Legitimate, Non-Discriminatory Reason for Employment Decision

Defendants assert that:

> the City terminated Plaintiff's employment after determining that she: (1) engaged in insubordination by disobeying a direct order and refusing to return to City Hall to meet with her immediate supervisor on December 7, 2007; (2) threatened a citizen when she told Wood that she would "kill his ass" if she lost her job because of him; and (3) failed to perform her job responsibilities by spending little time at City

---

[23] Plaintiff had worked for the City as a Code Enforcement Officer/City Marshal since September 2002. "[W]here a plaintiff has held a position for a significant period of time, qualification for *that* position, sufficient to satisfy the test of a prima facie case can be inferred." Pace v. So. Ry. Sys., 701 F.2d 1383, 1386 n.7 (11th Cir.) (emphasis in original), cert denied, 464 U.S. 1018 (1983).

[24] Citing her own declaration, Plaintiff asserts that "[e]ither Stacy Jarrard or Tim Martin performed Plaintiff's duties after her termination." (Doc. 62, Pl. Br. at 23 n.21). Although Plaintiff's declaration does not support that assertion, in the City's October 2008 response to the EEOC, the City asserts that "Mr. Jarrard was simply a current employee who had sufficient experience to absorb the duties that [Plaintiff] has been assigned without requiring the City to hire a new employee" (Ex. Q to Doc. 62 at 7), and Lewis testified that Martin was promoted to replace Jarrard when Jarrard left the City (see Lewis Dep. at 27). Thus, it appears that Jarrard assumed Plaintiff's responsibilities, and Plaintiff therefore can satisfy the last element of her *prima facie* case. See, e.g., Alexander v. Chattahoochee Valley Cmty. College, 325 F. Supp. 2d 1274, 1282 (M.D. Ala. 2004) (finding that plaintiff had "made a prima-facie case by showing that she performed many of the duties of Admissions Director and that the position was eliminated and its functions were given to a white person"); Levie v. AT&T Comms., Inc., No. 1:88-cv-2132-RLV, 1990 U.S. Dist. LEXIS 5614, at *11-12 (N.D. Ga. Mar. 15, 1990) (finding that Plaintiff established a *prima facie* case of age discrimination where he showed that his "duties were assigned to people outside his protected class"), aff'd, 929 F.2d 706 (11th Cir. 1991).

Furthermore, as discussed *infra*, the undersigned finds that Plaintiff has pointed to evidence of Lewis's discriminatory animus that raises a reasonable inference of her employers' discriminatory intent; therefore, she can make out her *prima facie* case based on that evidence. See Smith, 2011 U.S. App. LEXIS 13363, at *17.

Hall during work hours when her whereabouts and activities during
that time were unknown.

(Doc. 56, Def. Br. at 25 (footnote omitted)).   In his Notice of Proposed Adverse
Action, Lewis wrote that he was proposing Plaintiff's termination for:
"Insubordination," based on Plaintiff's refusal to return to City Hall to meet with
Lewis on December 7, 2007; "Threat to Do Bodily Harm," for "threaten[ing] to kill
[Wood] if [she] lost [her] job with the City because of his call to City Hall"; and
"Failure to Perform Job Responsibilities," based on "a regular practice of making
brief appearances in City Hall at strategic times throughout the day and then
disappearing for the great majority of [her] shifts without checking in with the
office." (Ex. 13 to Teal Dep.).[25]   Following its receipt of the Notice of Proposed
Adverse Action and information about Huhn's investigation, the City Council then
voted unanimously to terminate Plaintiff's employment.  (Ex. 14 to Teal Dep.).

The undersigned finds that Defendants have met their "exceedingly light"
burden of articulating a legitimate,  non-discriminatory  reason for terminating
Plaintiff.

_____

[25] Lewis also cited as reasons, "Refusal to Participate in . . . the City's Investigation," based
on Plaintiff's alleged refusal to be interviewed by the Investigator; and "Interference with[ ] the
City's Investigation," based on her alleged refusal to be interviewed and "threat of bodily harm to
a citizen who was also a witness to the City's investigation." (Ex. 13 to Teal Dep.).  However,
Defendants do not appear to rely on those reasons for her termination.
        Lewis also considered "information suggesting the possibility that [Plaintiff had] been
consuming alcohol, been under the influence of alcohol while on duty, and/or had alcohol on [her]
person while on duty," based on witness accounts of smelling alcohol on Plaintiff's breath, but he
found "that the evidence currently available [was] inadequate to support a charge under the City's
Personnel Management System at [that] time."  (Ex. 13 to Teal Dep. at 3).

### c.  <u>Pretext</u>

Plaintiff argues that she has pointed to evidence from which a reasonable factfinder could find that Defendants' articulated reasons are "unworthy of credence," as well as "evidence from which a reasonable factfinder could conclude that Defendant Lewis was 'more likely' motivated by a discriminatory motive than by any of the proffered nondiscriminatory reasons."  (Doc. 62, Pl. Br. at 24).  A plaintiff "may satisfy her burden [of demonstrating pretext] either by offering evidence that [her employer] more likely than not acted with a discriminatory motive, or by showing that its proffered reasons are not credible, unless the record conclusively shows that the real motive was a non-proffered reason that is non-discriminatory."  <u>Alvarez v. Royal Atl. Developers, Inc.</u>, 610 F.3d 1253, 1265 (11th Cir. 2010).

As discussed *infra* in the analysis of Plaintiff's retaliation claims, the undersigned finds that Plaintiff has not created an issue of fact on whether each of Defendants' articulated reasons for terminating her is credible.  However,  the undersigned finds that Plaintiff has created a genuine issues of material fact on whether Defendants were "more likely than not" motivated by discriminatory animus toward Plaintiff because of her sex, rather than by the reasons articulated by Defendants.  Therefore, she has created a triable issue of fact on whether Defendants' reasons were a pretext for sex discrimination.

Plaintiff has produced evidence that shortly after Lewis became City

31

Manager, he indicated that he did not like women in law enforcement.  There is also evidence that, within a day or two before he placed Plaintiff on administrative leave and initiated an investigation into her conduct, he threatened Wood with arrest or the non-renewal of his business license if Wood did not sign a statement against Plaintiff, and he also told  Wood, referring to Plaintiff, that he "had been looking for a reason to fire this bitch for 4 years."  Defendants argue, however, that Lewis's alleged comments, "standing alone, and made four (4) years apart from one another," do not "create a reasonable inference of pretext with respect to Defendant Lewis' legitimate, non-discriminatory reasons for placing Plaintiff on leave and later, recommending her termination."  (Doc. 78, Reply at 10).  The undersigned finds otherwise.

In Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 810 (11th Cir. 2010), the Eleventh Circuit determined that "[c]alling a female colleague a 'bitch' is firmly rooted in gender.  It is humiliating and degrading based on sex." See also Beckford v. Dep't of Corr., 605 F.3d 951, 960 (11th Cir. 2010) (noting that the court had ruled that words such as "bitches" are "gender-specific and highly offensive epithets [that] evidence  sex-based harassment under Title VII"). " 'Language not amounting to direct evidence, but showing some [discriminatory] animus, may be significant evidence of pretext once a plaintiff has set out the prima facie case.' " Wilson v. B/E Aero, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) (quoting Jones v. Bessemer Carraway Med. Ctr., 151 F.3d 1321, 1323 n.4 (11th Cir. 1998)).

Evidence that Lewis referred to Plaintiff as a "bitch" in the context described by Wood and that Lewis indicated he did not like women in law enforcement must be credited for summary judgment purposes. Viewing the evidence in the light most favorable to Plaintiff, Lewis's alleged comment to Wood that he "had been looking for a reason to fire this bitch for 4 years," is not necessarily unrelated to Lewis's alleged comment four years earlier that he did not like women in law enforcement, a comment that was followed by frequent performance counseling and criticisms of Plaintiff.  Moreover, Lewis's alleged statement to Wood was made only one day before he decided to place Plaintiff on suspension; it was made in the context of Lewis's own investigation into alleged wrongdoing by Plaintiff; and it evidences a desire to terminate Plaintiff's employment.

Given this evidence, the undersigned finds there is an issue of fact on whether Lewis was motivated by discriminatory animus based on Plaintiff's sex when he took action that ultimately led to her termination, i.e., he placed her under surveillance, he placed her on administrative leave, he initiated an investigation of Plaintiff's activities, and he then recommended that Plaintiff be terminated, a recommendation the City Council accepted.  Accordingly, Plaintiff has met her summary judgment burden at the pretext stage of the analysis, see Alvarez, 610 F.3d at 1265, and a jury must decide whether Defendants' articulated reasons for terminating Plaintiff are a pretext for sex discrimination. See, e.g., Rioux v. City of Atlanta, 520 F.3d 1269, 1279, 1282 (11th Cir. 2008) (finding that the plaintiff had met "his burden of presenting disputed facts

showing Appellees were motivated by a discriminatory reason in selecting the level of discipline Rioux received, in contrast to any discipline he could or would have received in the absence of the race-based pressure exerted," and therefore, he met his burden of demonstrating pretext).

The Court must also address Defendants' argument that the City Council, and not Lewis, "was the actual decisionmaker" (Doc. 84, Def. Br. at 8), and that "the alleged discriminatory motives of Defendant Lewis . . . cannot be attributed to the decisionmakers with respect to Plaintiff's termination [i.e., the City Council] based on a 'cat's paw' theory, as the decisionmakers' independent reviews break any causal link between the alleged unlawful motive and the adverse employment actions at issue." (Doc. 78, Reply at 11 n.8).[26] Defendants assert that "it is undisputed that the Council reviewed Huhn's Report of Investigation, as well as the Notice of Proposed Adverse Action, before reaching the conclusion that Plaintiff's conduct warranted termination." (Id.).

After Defendants filed their reply in support of their motion for summary judgment, the Supreme Court issued its decision in Staub v. Proctor Hospital, 131 S. Ct. 1186 (2011). In that case, the Court "consider[ed] the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the

---

[26] "The term 'cat's paw' derives from a fable conceived by Aesop," in which "a monkey induces a cat by flattery to extract roasting chestnuts from the fire," and "[a]fter the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." Staub v. Proctor Hosp., 131 S. Ct. 1186, 1190 n.1 (2011).

ultimate employment decision." Id. at 1189.  Staub, the plaintiff, claimed that his employer terminated him because of his membership in the United States Army Reserve, in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA").  Id. at 1189-90.  Two of Staub's supervisors, Mulally and Korenchuk, "were hostile to Staub's military obligations," and they made statements expressing that hostility.  Id. at 1189.  Also, Staub's immediate supervisor, Mulally, issued a corrective action against him, an action Staub asserted was groundless.  Id.  A few months later, one of Staub's co-workers complained to Defendant's vice-president, Linda Buck, about Staub's "frequent unavailability and abruptness."  Id.  Three weeks later, Korenchuk told Buck "that Staub had left his desk without informing a supervisor, in violation of the January Corrective Action," an accusation Staub contended was false.  Id.  Relying on Korenchuk's accusation and after reviewing Staub's personnel file, Buck then decided to terminate Staub.  Id.  Buck denied Plaintiff's grievance of that decision and "adhered to her decision."  Id. at 1189-90.

The Court noted that USERRA and Title VII are "very similar" in that they both provide that an employer violates the respective statute if a characteristic protected by the statute was "a motivating factor" in the employer's decision.  Id. at 1191 (comparing 38 U.S.C. § 4311(c) with 42 U.S.C. §§ 2000e-2(m)).[27]  The

---

[27] 42 U.S.C. § 2000e-2(m) provides, "Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

Court explained that "[t]he central difficulty . . . is construing the phrase 'motivating factor in the employer's action' [w]hen the company official who makes the decision to take an adverse employment action . . . has no discriminatory animus but is influenced by previous company action that is the product of a [discriminatory] animus in someone else."  Id.   The Court held "that if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  Id. at *1194 (footnote omitted) (emphasis in original).  The Court explained:

> Animus and responsibility for the adverse action can both be attributed to the earlier agent (here, Staub's supervisors) if the adverse action is the intended consequence of that agent's discriminatory conduct.  So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable under USERRA.  And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm.

Id. at 1192.

The undersigned finds the Court's analysis in Staub to be instructive in this case, where there are issues of fact on whether Lewis bore discriminatory animus toward Plaintiff because of her sex, and whether he intended, for discriminatory reasons, that she be terminated, as described *supra*.  Furthermore, it is

undisputed that he recommended she be terminated (Ex. 13 to Teal Dep.), and

that the City Council adopted his recommendation.  (See Ex. 14 to Teal Dep.).

Defendants contend, however, that Staub is inapplicable to this case.  They

argue:

> [T]he allegations of misconduct which were investigated by the
> independent investigator and presented to the City Council as the
> basis for Defendant Lewis' recommendation of termination did not
> originate from Lewis (the allegedly biased supervisor).  To the
> contrary, it is undisputed that the allegations were first made  by
> Plaintiff's co-workers to Defendant Lewis and that, in response, an
> investigation was launched which ultimately culminated in Plaintiff's
> termination.

(Doc. 84, Def. Br. at 4-5 (emphases in original)).  Defendants also argue:

> [T]here is no evidence that members of the City Council merely
> "rubber stamped" Defendant Lewis' recommendation.  To the
> contrary, they were provided the opportunity to carefully review the
> Investigation Report on their own and to consider Lewis'
> recommendation for several days prior to voting whether to terminate
> Plaintiff's employment.

(Id. at 9-10).  The undersigned finds that Staub compels rejection of Defendants'

arguments.

In Staub, the Court considered evidence that, in addition to the negative

input from one of Staub's supervisors who was hostile to Staub's military

obligations, the decisionmaker (Buck) had received negative information about the

plaintiff from a non-biased coworker, and that Buck also reviewed the plaintiff's

personnel file and considered the plaintiff's grievance of the termination, but still

"adhered to her decision." 131 S. Ct. at 1189-90. The Court declined "to adopt a rule immunizing an employer who performs an independent investigation," however. Id. at 1193. The Court explained that "if the employer's investigation results in an adverse action **for reasons unrelated to the supervisor's original biased action** . . . , then the employer will not be liable." Id. (emphasis added). However, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, **apart from the supervisor's recommendation**, entirely justified." Id. (emphasis added).

As discussed *supra*, there is evidence that Lewis was involved in investigating Plaintiff's conduct before he decided to place her on administrative leave pending investigation—he allegedly threatened a witness in order to obtain a statement harmful to Plaintiff while expressing animosity toward her sex and the desire to find a reason to fire her, and he directed Jarrard to conduct surveillance on her. There is also evidence that Lewis participated in the decision to place her on administrative leave and investigate her, and it is uncontroverted that he then recommended that she be terminated. Although there is evidence that City Council members reviewed Huhn's investigative report before making their decision (see Laboa Decl., Ex. 11 to Doc. 56, ¶ 5; Lord Decl., Ex. 13 to Doc. 56, ¶ 5; Peters Decl., Ex. 14 to Doc. 56, ¶ 5; Scott Dep. at 51-53), there is evidence that the City Council also reviewed and considered Lewis's recommendation that

Plaintiff be terminated, as set forth in the Notice of Proposed Adverse Action (see Laboa Decl., ¶¶ 6-7; Lord Decl., ¶¶ 6-7; Peters Decl., ¶¶ 6-7; Scott Dep. at 51-53; Norton Dep. at 21-25).

Furthermore, Huhn did not recommend Plaintiff's termination.  Rather, it was Lewis who recommended that she be terminated, a recommendation the City Council adopted. Therefore, there are genuine issues of fact on whether the City Council's decision to terminate Plaintiff was based on "reasons unrelated to the supervisor's original [allegedly] biased action," and whether the City Counsel determined that her termination was "apart from [Lewis's] recommendation, entirely justified ." Staub, 131 S. Ct. at 1193; see, e.g., Ley v. Wisconsin Bell, Inc., No. 09-C-1108, 2011 U.S. Dist. LEXIS 73415, at *4-5 (E.D. Wis. July 7, 2011). In Ley, the court rejected the defendant's argument that the allegedly biased manager was "nothing more than a conduit of objective, recorded information":

> By recommending termination, [the manager] did significantly more than merely provide "objective, recorded information."  A recommendation in favor of termination is an expression of a manager's opinion; it is *not* a statement of objective fact.  Making such a recommendation is an action that could certainly be a proximate cause of termination.  These factual issues must be decided by a jury.

2011 U.S. 73415, at *4-5 (emphasis in original).

Thus, the undersigned finds that there are genuine issues of material fact regarding whether Lewis "performed an act motivated by [discriminatory] animus" toward Plaintiff's sex "that [was] intended by [Lewis] to cause an adverse

employment action," and whether "that act [was] a proximate cause of the ultimate employment action." Staub, 131 S. Ct. at 1194.  Accordingly, it is **RECOMMENDED** that the Defendant City's motion for summary judgment be **DENIED** on Plaintiff's Title VII and § 1983 discriminatory termination claims.

With respect to Defendant Lewis, however, as discussed *infra*, the undersigned finds that he is protected by the doctrine of qualified immunity and is therefore entitled to summary judgment on Plaintiff's § 1983 discriminatory termination claim.

### d.    **Qualified Immunity**

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The court applies a two-part analysis in determining whether qualified immunity protects a defendant:

> First, we consider whether the defendant government official has proved that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred.  If so, then we examine whether the plaintiff has demonstrated that the defendant violated clearly established law.

Maggio v. Sipple, 211 F.3d 1346, 1350 (11th Cir. 2000) (internal quotations omitted).  "To defeat a defendant's claim to qualified immunity, a plaintiff must show that a reasonable person in the defendant's position would have been on

40

notice that his actions violated clearly-established law." Id. at 1354.

There are two parts to the question whether the defendant public official's actions violated clearly established constitutional law, and these questions need not be addressed in a particular order. Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009).  On summary judgment, "a court must decide whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right [and] whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. at 232 (internal citations omitted).  "The burden rests on the plaintiff to show that qualified immunity is not appropriate." Snider v. Jefferson State Cmty. Coll., 344 F.3d 1325, 1327 (11th Cir. 2003).  However, as is the general rule when a court considers a motion for summary judgment, the court must consider the facts in the light most favorable to the non-movant. See Barnett v. Florence, 409 F. App'x 266, 270 (11th Cir. 2010) (unpublished decision) (explaining that, in evaluating a qualified immunity claim on summary judgment appeal, the facts "must be [construed] . . . in the light most favorable to the plaintiff"); see also Johnson v. City of Fort Lauderdale, Fla., 126 F.3d 1372, 1378 (11th Cir. 1997) ("In making this determination, the court must resolve all factual disputes about the defendant's conduct in favor of the plaintiff.").

At the time Lewis recommended that Plaintiff be terminated, "the right to be free from employment discrimination was clearly established." Rioux, 520 F.3d at 1283; see also Stuart v. Jefferson Cnty. Dep't of Human Res., 152 F. App'x 798,

803 n.6 (11th Cir. 2005) (unpublished decision) (finding that "[t]he district court also properly rejected Shanahan's defense of qualified immunity because gender discrimination was a clearly established violation of law at the time of the alleged violations") (citing Williams v. Consolidated City of Jacksonville, 341 F.3d 1261, 1270-71 (11th Cir. 2003), cert. denied, 543 U.S. 1187 (2005)).  "However, the 'clearly established' prong of the qualified immunity analysis asks the question 'in light of the specific context of the case, not as a broad general proposition.' " Rioux, 520 F.3d at 1283 (quoting Williams, 341 F.3d at 1269).  Thus, to defeat qualified immunity for Lewis, Plaintiff "must demonstrate that" a reasonable manager would know that recommending her termination "in the factual circumstances presented here violated clearly established law."  Id.

"Clearly established law provides that state officials 'can be motivated, in part, by a dislike or hostility toward a certain protected class to which a citizen belongs and still act lawfully . . . .' " Id. (quoting Foy v. Holston, 94 F.3d 1528, 1534 (11th Cir. 1996)).   In Foy, the court explained:

> One trigger to [that] doctrine's application depends upon whether the record establishes that the defendant, in fact, did possess a substantial lawful motive for acting as he did act.  At least when an adequate lawful motive is present, that a discriminatory motive might also exist does not sweep qualified immunity from the field even at the summary judgment stage.  Unless it, as a legal matter, is plain under the specific facts and circumstances of the case that the defendant's conduct--despite his having adequate lawful reasons to support the act--was the result of his unlawful motive, the defendant is entitled to immunity.  Where the  facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful *and* unlawful motivations) and pre-existing law

42

does not dictate that the merits must be decided in plaintiff's favor, the defendant is entitled to immunity.

Foy, 94 F.3d at 1534-35.

In this case, there is evidence, discussed *supra*, that Lewis was motivated by discriminatory animus in deciding to recommend Plaintiff's termination. However, based on such evidence as Plaintiff's admission that she did not return to City Hall as directed by Lewis, and the reports contained in Tim Huhn's investigative report, the undersigned finds it is uncontroverted that Lewis was also motivated by lawful considerations when he made that recommendation, as discussed in more detail *infra* in the analysis of Plaintiff's retaliation claims. Plaintiff has not shown that a reasonable manager would have known that recommending Plaintiff's termination under these circumstances violated clearly established law. Thus, Lewis is entitled to qualified immunity. See, e.g., Rioux, 520 F. 3d at 1285 (finding that appellees were entitled to qualified immunity because "Appellees were in fact motivated, *at least in part*, by objectively valid reasons in demoting Rioux," and "[w]e cannot say that, even assuming Appellees were acting with improper race-based animus or a desire to address race-balancing in the workplace, reasonable officials faced with the same evidence of Rioux's violations of work rules would have known that demoting Rioux violated clearly established federal law" (emphasis added)).

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary

judgment be **GRANTED** on Plaintiff's 42 U.S.C. § 1983 sex discrimination claim

against Defendant Lewis.

**C.     Plaintiff's Equal Pay Act Claim (Count Two)**

Plaintiff alleges that Defendants violated the EPA and the FLSA by "paying

lower wages to Plaintiff, a female, than to the male employee performing

substantially similar work."  (Doc. 5, Am. Compl., ¶¶ 53, 54).

The Equal Pay Act ("EPA"), which is part of the FLSA,[28] provides in relevant

part:

> No employer having employees subject to any provisions of this
> section shall discriminate, within any establishment in which such
> employees are employed, between employees on the basis of sex by
> paying wages to employees in such establishment at a rate less than
> the rate at which he pays wages to employees of the opposite sex in
> such establishment for equal work on jobs the performance of which
> requires equal skill, effort, and responsibility, and which are
> performed under similar working conditions, except where such
> payment is made pursuant to (i) a seniority system; (ii) a merit
> system; (iii) a system which measures earnings by quantity or quality
> of production; or (iv) a differential based on any other factor other
> than sex . . . ."

29 U.S.C. § 206(d)(1).  "An employee demonstrates a prima facie case of an Equal

Pay Act violation by showing that the employer paid employees of opposite genders

different wages for equal work for jobs which require 'equal skill, effort, and

responsibility, and which are performed under similar working conditions.' "

Steger v. GE, 318 F.3d 1066, 1077-78 (11th Cir. 2003) (quoting Irby v. Bittick, 44

---

[28] See Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1526 (11th Cir. 1992).

44

F.3d 949, 954 (11th Cir. 1995)).  "Once the employee presents a prima facie case, the employer may avoid liability by proving by a preponderance of the evidence that the pay differences are based on '(i) a seniority system; (ii) a merit system; (iii) a  system  which measures earnings by quantity or quality of production; or (iv) . . . any other factor other than sex.' " <u>Steger</u>, 318 F.3d at 1078 (quoting 29 U.S.C. § 206(d)(1)).  "The burden to prove these affirmative defenses is heavy and must demonstrate that 'the factor of sex provided *no basis* for the wage differential.' " <u>Steger</u>, 318 F.3d at 1078 (quoting <u>Irby</u>, 44 F.3d at 954 (emphasis in original)). "Once the employer's burden is met, the employee 'must rebut the explanation by showing with affirmative evidence that it is pretextual or offered as a post-event justification for a gender-based differential.' " <u>Steger</u>, 318 F.3d at 1078 (quoting <u>Irby</u>, 44 F.3d at 954).

### 1. **Plaintiff's *Prima Facie* Case**

Plaintiff contends that she can satisfy her *prima facie* case under the EPA because "[s]he and Marshal Jarrard were both employed as city marshals [and t]heir jobs were substantially similar and had a common core of tasks." (Doc. 62, Pl. Br. at 13).  Defendants argue that Plaintiff cannot establish a *prima facie* case because she "cannot show that the City paid Jarrard a higher wage for equal work requiring equal skill, effort, and responsibility, performed under similar working conditions." (Doc. 56, Def. Br. at 14-15).  Defendants point to evidence that, in addition to his code enforcement duties, Jarrard performed building inspection

duties for the City that Plaintiff did not.  (Id. at 16).

The undersigned will assume, without deciding, that Plaintiff can establish a *prima facie* case under the EPA.  However, as discussed *infra*, the undersigned finds that Defendants have presented evidence to show that the pay differential between Plaintiff's and Jarrard's pay was based on a "factor other than sex," and Plaintiff has failed to produce affirmative evidence that would show Defendants' explanation for the pay difference is "pretextual or offered as a post-event justification for a gender-based differential."  See Irby, 44 F.3d at 954.

### 2.    **Defendants' Affirmative Defense**

Defendants argue that "the pay disparity between [Plaintiff] and Jarrard was based on . . . 'factors other than sex.' " (Doc. 56, Def. Br. at 18).  "'Any other factor other than sex' is a general exception to application of the EPA." Irby, 44 F.3d at 955. "[T]he 'factor other than sex' exception applies when the disparity results from unique characteristics of the same job; from an individual's experience, training, or ability; or from special exigent circumstances connected with the business." Glenn v. General Motors Corp., 841 F.2d 1567, 1571 (11th Cir.), cert. denied, 488 U.S. 948 (1988).

As discussed *supra*, Defendants have produced the following uncontroverted evidence: (1) that Jarrard, who had previous construction experience as well as law enforcement experience, was hired to conduct building inspections after the City's previous building inspector, Layne, left the City's employment, and to

46

perform code enforcement duties, and (2) that Jarrard performed building inspection duties Plaintiff did not perform.  Thus, the City was able to fill the vacancy left by Layne by hiring someone who could conduct building inspections, and who could also perform code enforcement responsibilities.

The undersigned finds that a reasonable jury could find from this evidence that the pay differential between Plaintiff and Jarrard was based on "a factor other than sex."

### 3.   Pretext

Plaintiff relies on the same pretext arguments she made in support of her Title VII and § 1983 wage discrimination claims to show pretext with respect to her EPA claim.  (See Doc. 62, Pl. Br. at 17 n.15).  For the reasons discussed *supra* in the analysis of Plaintiff's Title VII and § 1983 wage discrimination claims, the undersigned finds that Plaintiff has not produced evidence that creates an issue of fact on whether Defendants' reasons for the pay differential are pretextual.  See Leatherwood v. Anna's Linens Co., 384 F. App'x 853, 860 (11th Cir. 2010) (unpublished decision) (finding that, even if the plaintiff had established a *prima facie* case of wage discrimination under the EPA, she failed to rebut the defendant's asserted reason for the pay disparity between male and female keyholders, i.e., a staffing shortage when male employee was hired and the need to lure male employee away from competitor), cert. denied, 131 S. Ct. 1035 (2011).  Therefore, there is no "issue which should be reserved for trial."  Irby, 44 F.3d at

47

954.  Accordingly, the undersigned **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's Equal Pay Act claim (Count Two).

**D.** **Plaintiff's Title VII and EPA Retaliation Claim (Count Three)**

Plaintiff alleges that Defendant Dahlonega terminated her in retaliation for filing an EEOC charge in violation of Title VII and that both Defendants terminated her in retaliation for filing an EEOC charge in violation of the EPA.

**1.** **Analytical Framework for Retaliation Claims**

Under 42 U.S.C. § 2000e-3(a),  it is "an unlawful employment practice for an employer to discriminate against any . . . employee[ ] . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  The EPA makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act . . . ."  29 U.S.C. § 215(a)(3); see also EEOC v. Reichold Chems., Inc., 988 F.2d 1564, 1569 and n.3 (11th Cir. 1993) (noting that both Title VII and the EPA "state that it is unlawful for an employer to discriminate against an employee because she has brought charges relating to these statutes") (citing 42 U.S.C. § 2000e-3(a) and 29 U.S.C. § 215(a)(3)).

Retaliation claims under Title VII and the EPA are also analyzed under the

48

_McDonnell Douglas/Burdine_ burden-shifting framework used to prove disparate treatment cases by circumstantial evidence.   See _Johnson v. Booker T. Washington Broad. Serv., Inc._, 234 F.3d 501, 511 n.10 (11th Cir. 2000) (noting that "[r]etaliation claims do involve burden-shifting as in _McDonnell Douglas-Burdine_"); _Saridakis v. S. Broward Hosp. Dist._, No. 08-62005-CIV-ALTONAGA/Brown, 2010 U.S. Dist. LEXIS 64391, at *23 (S.D. Fla. June 7, 2010) (noting that retaliation claims under Title VII and the EPA "continue to be evaluated under the burden-shifting framework of _McDonnell Douglas_.").   Thus, the undersigned analyzes Plaintiff's Title VII and EPA retaliation claims under the _McDonnell Douglas_ framework.

To establish a _prima facie_ case of retaliation under Title VII or the EPA, in the absence of direct evidence, the plaintiff must show that "(1) [she] engaged in a statutorily protected activity; (2) the employer took an adverse employment action against [her]; and (3) there is a causal connection between the protected activity and the adverse action." _Berman v. Orkin Exterminating Co._, 160 F.3d 697, 701 (11th Cir. 1998); see also _Saridakis v. S. Broward Hosp. Dist._, 681 F. Supp. 2d 1338, 1353 n.5 (S.D. Fla. 2009) (noting that "[r]etaliation claims under Title VII and the Equal Pay Act require the same elements to establish a prima facie case").

If the plaintiff establishes a _prima facie_ case, the burden shifts to the defendant to articulate a legitimate, non-retaliatory basis for the action.

49

Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001); see also Jones v. Westside-Urban Health Ctr., Inc., 760 F. Supp. 1575, 1581 (S.D. Ga. 1991) (considering defendant's proffer of legitimate, non-retaliatory reason for termination in EPA retaliation claim). If the defendant does so, then in order to avoid summary judgment, the plaintiff must point to evidence from which reasonable jurors could conclude that the employer's proffered explanations are a pretext for retaliation.  See Pennington, 261 F. 3d at 1266.

2.      **Plaintiff's *Prima Facie* Case**

It is undisputed that Plaintiff engaged in statutorily protected activity when on or about March 5, 2008, she filed an EEOC charge complaining that Defendant paid her less than a younger male marshal in violation of Title VII, the EPA and the ADEA.  (Ex. 15 to Teal Dep.).  Plaintiff has also shown that her employer took an adverse employment action against her when it terminated her employment on or about April 10, 2008.  The parties dispute, however, whether there is evidence of a causal connection between those events.

Defendants argue that "the combination of protected activity followed by adverse action, in and of itself, is insufficient to establish the requisite causal link." (Doc. 56, Def. Br. at 32).  Defendants contend that "it is undisputed that Plaintiff had already been placed on administrative leave pending investigation at the time she first engaged in protected activity." (Id. at 32-33).  Defendants also argue that "[b]y the time of the filing of her Charge, Plaintiff had already

50

committed each of the infractions for which she was being investigated and which ultimately formed the basis for Defendants' termination decision." (Id. at 33). Thus, Defendants argue, "Plaintiff cannot make out the requisite showing of causation." (Id.).

Quoting Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999), Plaintiff asserts that "[t]he Eleventh Circuit has 'plainly held' that a plaintiff satisfies the causation requirement of her prima facie case by 'provid[ing] sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity between this awareness and the adverse employment action.' " (Doc. 62, Pl. Br. at 34). Plaintiff contends that she "has satisfied the requirements of her prima facie case" because she "was terminated only five (5) weeks after filing her charge of discrimination," and "there is no question that Defendants were aware of Plaintiff's protected conduct." (Id. at 34). Defendants admitted that "Defendant Lewis and the Defendant City had knowledge of [Plaintiff's EEOC] charge before Plaintiff's termination." (Pl. SMF ¶ 39; Def. Resp. to Pl. SMF ¶ 39). Based on Defendants' admission, the undersigned finds that Plaintiff has shown, for purposes of summary judgment, that Defendants were aware of her protected activity when she was terminated.

The causal connection prong of a retaliation claim is satisfied by evidence that the protected action and the adverse employment action are not totally unrelated. Berman, 160 F.3d at 701. "The burden of causation can be met by

51

showing close temporal proximity between the statutorily protected activity and the adverse employment action." <u>Thomas v. Cooper Lighting, Inc.</u>, 506 F.3d 1361, 1364 (11th Cir. 2007). " '[T]emporal proximity, standing alone [however], may not be sufficient to establish that causal link.' " <u>Bazemore v. Ga. Tech. Auth.</u>, No. 1:05-cv-1850-WSD-WEJ, 2007 U.S. Dist. LEXIS 20780, at *13 n.2 (N.D. Ga. March 23, 2007) (quoting <u>Spence v. Panasonic Copier Co.</u>, 46 F. Supp. 2d 1340, 1348 (N.D. Ga.), <u>aff'd</u>, 204 F.3d 1122 (11th Cir. 1999)); <u>see also</u> <u>Hankins v. AirTran Airways, Inc.</u>, 237 F. App'x 513, 520 (11th Cir. 2007) (unpublished decision) ("[C]lose temporal proximity between two events, standing alone, is not a panacea, absent any other evidence that the employment decision was causally related to the protected activity."). Furthermore, " 'any inference of retaliatory intent otherwise created by a short lapse of time can be dispelled when intervening factors are established.' " <u>Bazemore</u>, 2007 U.S. Dist. LEXIS 20780, at *13 n.2 (quoting <u>Wu v. Southeast-Atlantic Bev. Corp.</u>, 321 F. Supp. 2d 1317, 1337 (N.D. Ga. 2004)).

The undersigned finds that, without more, the temporal proximity between Plaintiff's protected activity, i.e., her EEOC charge filed on or about March 5, 2008, and her termination on or about April 10, 2008, is insufficient to satisfy the causal connection element of her *prima facie* case. It is uncontroverted that Lewis placed Plaintiff on administrative leave on or about December 8, 2007 pending an investigation into alleged misconduct that occurred prior to that date. Tim Huhn

of Huhn & Associates, Inc. then conducted an investigation into those events, and his investigation, based on his interview with City employees and other witnesses, showed that Plaintiff had failed to return to City Hall as directed by Lewis on December 7, 2007; she had told Wood that she would "kill his ass," or words to that effect, if she lost her job because of Wood; and she had been increasingly absent from City Hall for long periods of time without communicating her whereabouts to City personnel (See Ex. 12 to Teal Dep. at 1260-61). These were the charges being addressed when the investigation began (see Ex. 3 to Huhn Dep.), and they were the same charges Lewis subsequently included in his Notice of Proposed Adverse Action (see Ex. 13 to Teal Dep.).[29] The fact that Plaintiff had already been placed on administrative leave and was being investigated for the misconduct that ultimately formed the basis for her termination when she filed her EEOC charge undermines her contention that there is a causal connection between her protected activity and her termination. See, e.g., Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001) (explaining that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatsoever of causality"); Byrd v. Tyson Foods, Inc., No. 5:10-CV-161(MTT), 2011 U.S. Dist. LEXIS 81481, at *10 (M.D. Ga. July 26, 2011) (finding that the plaintiff could not establish a causal link

---

[29] Plaintiff also testified that the only reason she believed that Defendants terminated her because she had filed an EEOC charge was the timing of those events. (Teal Dep. at 304-05).

between his protected activity and his termination "because his protected expression . . . occurred *after* he was placed on suspension for sleeping on duty and an investigation had begun" (emphasis in original)).  Plaintiff has offered no evidence to show causation apart from temporal proximity.  Therefore, the undersigned finds that Plaintiff has not created a genuine issue of material fact on the causation element of her *prima facie* claim of retaliation.

Furthermore, even if Plaintiff could make out a *prima facie* case of retaliation, the undersigned finds that Defendants would be entitled to summary judgment on Plaintiff's retaliation claims because Plaintiff has not created an issue of fact on whether Defendants' articulated legitimate, non-retaliatory reasons for terminating her are a pretext for retaliation, as discussed *infra*.

### 3.   **Defendants' Articulated Legitimate, Non-Retaliatory Reasons for Employment Decision**

In opposition to Plaintiff's retaliation claim, Defendants assert the reasons previously discussed for their termination of Plaintiff, i.e., she:

> (1) engaged in insubordination by disobeying a direct order and refusing to return to City Hall to meet with her immediate supervisor on December 7, 2007; (2) threatened a citizen when she told Wood that she would "kill his ass" if she lost her job because of him; and (3) failed to perform her job responsibilities by spending little time at City Hall during work hours when her whereabouts and activities during that time were unknown.

(Doc. 56, Def. Br. at 25, 34-35 (footnote omitted)). The undersigned finds that Defendants have articulated legitimate, non-retaliatory reasons for that decision.

4.    __Pretext__

Plaintiff contends that "Defendants' allegedly non-retaliatory reasons for Plaintiff's discharge fail for the same reasons described in Section IV.A of this brief." (Doc. 62, Pl. Br. at 35 n.31).  In her discussion of her sex discrimination claims, Plaintiff argued that she had pointed to evidence from which a reasonable factfinder could find that Defendants' articulated reasons are "unworthy of credence," as well as "evidence from which a reasonable factfinder could conclude that Defendant Lewis was 'more likely' motivated by a discriminatory motive than by any of the proffered nondiscriminatory reasons."  (Doc. 62, Pl. Br. at 24).

As discussed *supra*, the undersigned finds that there are triable issues of fact on whether Defendants were motivated by Plaintiff's sex in deciding to terminate her, in light of evidence that Defendant Lewis made the statement that "he had never liked women in law enforcement" (Teal Dep. at 283); he made the statement to Wood that he had "been looking for a reason to fire that bitch for 4 years" (Wood Decl., ¶ 10) a day or two before he placed Plaintiff on administrative leave; and he threatened Wood with arrest or the loss of his business license when Wood refused to make a statement against Plaintiff.

That same evidence does not create an issue of fact on whether Defendants' reasons were a pretext for **retaliation**, however.  And Plaintiff has not pointed to evidence of retaliatory animus or evidence that raises a reasonable inference that Defendants terminated her because she engaged in protected activity.  See, e.g.,

55

Crawford v. Carroll, 529 F.3d 961, 977 (11th Cir. 2008) (finding that "a jury question exists on the issue of whether defendants' reasons for eliminating the job were a pretext for retaliation," but "Crawford has not . . . come forward with evidence adequate to create a jury question on the issue of whether defendants' proffered explanation for the decision in fact was a pretext for racial discrimination").

Furthermore, Plaintiff has not created an issue of fact with respect to whether **each** of Defendants' articulated reasons for terminating her is a pretext for retaliation. Defendants articulated three reasons for terminating Plaintiff: (1) she was insubordinate when she failed to return to City Hall as directed by Lewis on December 7, 2007; (2) she threatened a citizen by telling him she would "kill his ass," or words to that effect, if she lost her job; and (3) she failed to perform her job duties "by spending little time at City Hall during work hours when her whereabouts and activities during that time were unknown." (Doc. 56, Def. Br. at 25; Ex. 13 to Teal Dep.). In order to demonstrate pretext, Plaintiff must show that **each** reason articulated by Defendants is pretextual. See Chapman, 229 F.3d at 1037 (explaining that "[i]n order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that **each** of the employer's proffered nondiscriminatory reasons is pretextual" (emphasis added)). Plaintiff has failed to do that.

a.   **Insubordination**

56

Huhn's investigation showed that "[i]nformation was received that [Plaintiff] refused to obey a direct order from her immediate supervisor, Bill Lewis, on Friday, December 7, 2007" when "[s]he was called telephonically and asked to return to the office to meet with Bill Lewis," but "[s]he refused stating she is not coming back unless she has her attorney." (Doc. 12 to Teal Dep. at 1260). Lewis and Jarrard both told Huhn that Lewis had directed Plaintiff to return to City Hall on December 7, 2007, but she refused. (Id. at 1266-67, 1270-71). Plaintiff also admits that she refused to return. (Teal Dep. at 249-52; Doc. 62, Pl. Br. at 28).

Plaintiff argues, however, that "the evidence strongly permits an inference that she was not fired for this act of alleged insubordination," and she points to Lewis's comments to Wood when he attempted to get a statement from Wood, discussed *supra*. (Doc. 62, Pl. Br. at 28). While that evidence creates an issue of fact on whether Plaintiff's sex motivated the decision to terminate her, it does not create an issue of fact on whether Defendants' explanation that she was insubordinate is a pretext for retaliation.

In a further effort to cast doubt on that explanation, Plaintiff also asserts that Lewis "wait[ed] until after 5:00 p.m., i.e., until Plaintiff ha[d] left work for the day, to call her to discuss Jarrard's surveillance." (Doc. 62, Pl. Br. at 29). However, it is undisputed that Lewis did not arrive at City Hall until after Plaintiff had left. (See Statement Attach. to Ex. 1 to Jarrard Dep.; Ex. H to Doc. 62 at HUHN-0134). In addition, Plaintiff takes issue with some aspects of Huhn's

57

investigation (Doc. 62, Pl. Br. at 29), but her criticisms do not create an issue of fact on pretext because it is undisputed that she refused to return to City Hall as directed, her alleged insubordination was one of the issues to be investigated by Huhn, the investigation showed she had refused to return to City Hall as directed, and Huhn's report of his investigation was provided to the City Council for review before voting on Plaintiff's termination (see Laboa Decl., Ex. 11 to Doc. 56, ¶ 5; Lord Decl., Ex. 13 to Doc. 56, ¶ 5; Peters Decl., Ex. 14 to Doc. 56, ¶ 5; Scott Dep. at 51-53).[30]   Accordingly, Plaintiff has not pointed to evidence from which a reasonable juror could find that Defendants' asserted reliance on her insubordination, i.e., her failure to return to City Hall, is a pretext for retaliation.

### b.   Threatening a Citizen

Huhn's investigation showed that "[i]nformation was received that [Plaintiff] told Jimmy Woods [sic] that if she loses her job she would kill him and/or shoot him." (Ex. 12 to Teal Dep. at 1260).   Jarrard told Huhn that Wood told Jarrard he called Plaintiff to tell her "he did not mean to get her into trouble," but "then she started cursing him and said that if she loses her job because of him she will

---

[30] Huhn's report also showed that Planning & Zoning Director Chris Head told Huhn that Plaintiff told her on occasion after leaving a meeting with Lewis that "she was not going to do what Lewis wanted," and that Plaintiff "definitely had an attitude towards Bill Lewis and in [Head's] opinion [Plaintiff] did not like Bill Lewis at all from comments [she] made to [Head]." (Doc. 12 to Teal Dep. at 1278-79).   Marisa Pierce, City Court Clerk, also told Huhn that Plaintiff sometimes told her after leaving Lewis's office "that she was not going to do what she was requested,"and she "would make gestures and comments about Bill Lewis that were not very favorable," including profanity and "obscene gestures."   (Id. at 1283, 1284).   Ricky Stewart, Special Project Manager/City Engineer, told Huhn that he has heard Plaintiff "several times bad-mouth Bill Lewis." (Id. at 1290).

kill his ass, you son of a bitch and then hung up the phone." (Id. at 1272-73). Assistant City Clerk Oma Lou Stewart told Huhn that Wood had called her and told her he called Plaintiff, and Plaintiff told Wood "in one form or another something to the effect 'if you get me fired from my job, I will shoot you or kill you.'" (Id. at 1295, 1297-98).  Stewart told Huhn that Wood later left a message on her home answering machine and "stated that what he told her about his conversation with [Plaintiff] did not happen and to forget it," and that "[h]e was only joking and should not have told her about the conversation."  (Id. at 1298). City Council member Bill Scott told Huhn that Wood told him "[Plaintiff] was going to shoot my ass if I (Wood[ ]) cost her, her job," but that Wood told Scott "he was going to deny it ever happened."  (Id. at 1300, 1302).

Plaintiff does not dispute that she told Wood she would "kill his ass" if she lost her job because of him, because she believed Wood had informed the City that she hurt her arm at Merry's house, thus revealing that she had not told Lewis the truth about the incident.  (See Teal Dep. at 223, 233-35).  However, Plaintiff and Wood claim that she was just joking or kidding.  (Teal Dep. at 233; Wood Decl., Ex. G to Doc. 62, ¶ 6).

Defendants were entitled to disbelieve Plaintiff's explanation, however, based on the reports of Jarrard, Stewart and Scott contained in Huhn's investigation. See, e.g., Hankins, 237 F. App'x at 522 (explaining that "Hankins argument that the incident with Kerstetter was merely a joke is unavailing [to establish pretext],

because we have stated that the pretext inquiry is concerned with the employer's *perception* of the employee's performance, not the employee's own beliefs . . . . Here, we are satisfied that AirTran honestly believed its employee, Kerstetter, when he stated that he found Hankins' conduct to be threatening and offensive, irrespective of whether Hankins subjectively intended her behavior to be a joke" (emphasis in original)).   Accordingly, Plaintiff has not pointed to evidence from which a reasonable juror could find that Defendants' asserted reliance on her alleged threat to a citizen is a pretext for retaliation.

### c.   Failure to Perform Job Responsibilities

According to Huhn's report of his investigation, "[i]nformation was received that in recent months [Plaintiff] spends very little time at city hall and her exact whereabouts and activities were not known." (Ex. 12 to Teal Dep. at 1261).  Huhn wrote that "[i]nterviews with city employees indicated that within the last six months to one year [Plaintiff] would make an appearance at work, then leave and return around lunch time and then return again around 4:30 in the afternoon," and that "it was not known what she was doing when she was not at city hall." (Id.).  Specifically, City employees Oma Lou Stewart, Ricky Stewart, Chris Head and Lewis "all indicated that her activities during the day were not clear."  (Id. at 1261; see also id. at 1266, 1277-78, 1283-84, 1287, 1291-92, 1296).   For example, Ricky Stewart told Huhn that Plaintiff "would come in at 8 o'clock in the morning, then leave sometime between 9 and 9:30 a.m., come back around 12:00

60

stay for a short period of time (10-15 minutes), then leave and come back again around 4:30 to 4:45 p.m.," and that this "pattern" had been "ongoing for several months." (Id. at 1291). Stewart also reported that he had "seen her outside the city limits on Highway 52 which is the direction of her house, coming and going at different times during the day." (Id. at 1291-92). Huhn's report reflects that Oma Lou Stewart told him:

> Recently, in the last several months, she saw [Plaintiff] gradually spend more time away from city hall. She would come in and usually leave mid-morning, come back make an appearance during lunch, come back around 4:30 to 5:00 p.m. and then leave at 5 o'clock. She did not know what [Plaintiff] was doing in recent months, as there was a lack of communication with her when she was in the field. In the past she would frequently call in and ask for assistance [on a number of matters, but i]n the last several months there was very little communication with [Plaintiff] during the day.

(Id. at 1296). City Court Clerk Pierce also told Huhn that Plaintiff had not been at City Hall "most of the time in the last 90 days," and she did not know where Plaintiff was or what she was doing. (Id. at 1284). City Clerk Janet Jarrard told Huhn that she had "noticed over the last six months [Plaintiff] is gone most of the time and spends very little time in city hall." (Id. at 1287).

Plaintiff argues that her job duties required her to work outside of City Hall, and therefore, "[i]t should come as no surprise to anyone . . . that Plaintiff often spent 'little time' at City Hall; she had a job to do beyond the four walls of that building, and she did it." (Doc. 62, Pl. Br. at 27). Plaintiff's assertions do not address the aspect of this charge of misconduct that Plaintiff's "exact whereabouts

and activities were not known" (Ex. 12 to Teal Dep. at 1261), and statements by witnesses that she did not communicate with personnel in City Hall to indicate what work she was performing or where she was going.  Plaintiff has not controverted her employer's belief that she was not communicating her whereabouts and that she was spending time outside of City Hall on personal errands, such as shopping or banking, or going to her residence, rather than performing City work.

Furthermore, Plaintiff's denial that she was engaged in personal business during work hours is insufficient to demonstrate pretext.  The critical inquiry is what the decisionmakers believed.  See Alvarez, 610 F.3d at 1266 ("The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs[.]"); Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991); Boyce v. Belden, No. 3:99-CV-126 (DF), 2002 U.S. Dist. LEXIS 1550, at *27 (M.D. Ga. Jan. 30, 2002).

Finally, even if there is an issue of fact concerning whether this reason was pretextual, Plaintiff has failed to show that there is an issue of material fact on whether **each** of Defendants' reasons for terminating her is a pretext for retaliation.  Therefore, Defendants are entitled to summary judgment on Plaintiff's retaliatory termination claim.  See Chapman, 229 F.3d at 1037; Combs, 106 F.3d at 1538-43.

Because Plaintiff has failed to meet "head on and rebut" all of Defendants'

legitimate, non-retaliatory reasons for terminating her, and she has failed to point to evidence that the termination decision was motivated by retaliatory animus, she has failed to demonstrate that there is a jury question on pretext, and she cannot avoid summary judgment.  Thus, it is **RECOMMENDED** that Defendants' motion for summary judgment be **GRANTED** on Plaintiff's Title VII and EPA retaliation claims (Count Three).

## V.  Conclusion

It is **RECOMMENDED** that Defendants' Motion for Summary Judgment [Doc. 56] be **GRANTED in part and DENIED in part**.

**IT IS SO REPORTED AND RECOMMENDED** this 24th day of August, 2011.

*Susan S. Cole*
SUSAN S. COLE
United States Magistrate Judge

63